### GENET *v.* DELAWARE & H. CANAL CO.

*(Superior Court of New York City, General Term. May 10, 1888.)*

1. EVIDENCE—PAROL TO VARY WRITING.
    The declaration of the parties made at the time of the delivery of a written contract is not admissible to vary its terms, where the language of the contract itself is unambiguous.

2. SAME—COLLATERAL CONTRACT.
    Where a written contract requires defendant to take out only a certain quantity of coal from defendant's mine, but authorizes the taking of an unlimited additional quantity, parol evidence is not admissible to show that the contract was delivered in reliance on a promise by defendant to "work out the greatest quantity of coal," as such parol agreement is inconsistent with the written contract.

3. SAME—ADMISSIBILITY—CONFLICT OF LAWS—LEX FORI.
    In an action on a contract to be performed in another state the *lex fori* governs as to the admissibility of evidence.

4. MINES AND MINING—LEASES—ADJOINING MINES.
    Defendant was required by its contract to take 20,000 tons of coal yearly from plaintiff's land, with the privilege of an unlimited additional quantity, until all plaintiff's coal should be mined. The contract authorized defendant to erect all buildings, fixtures, etc., and dig shafts on the land; to use all the land which it "may deem necessary for the prosecution of its business, together with land for piling coal or culm, and all other appurtenances it may require for mining * * * under this agreement;" and to exercise such rights for the purpose of taking coal

from adjoining lands. *Held*, that defendant was not authorized to mine coal on the adjoining lands through a shaft on plaintiff's land until all plaintiff's coal was exhausted. INGRAHAM, J., dissenting.

5. SAME—INJUNCTION.

Piling culm and discharging water from the mines on the adjoining lands upon plaintiff's land, through the shaft thereon, is a burden not contemplated by the contract, and will be enjoined. INGRAHAM, J., dissenting.

6. ESTOPPEL—BY ACTS—ACQUIESCENCE.

Plaintiff's acquiescence in the erection by defendant of fixtures with a capacity sufficient to take out more than the amount required by the contract will not estop her from objecting to defendant's taking coal from adjoining lands, by means of such fixtures, before the coal in her land is exhausted, as the contract authorized defendant to take out an unlimited quantity. INGRAHAM, J., dissenting.

Appeal from judgment on report of referee.

Action by Augusta G. Genet against the Delaware & Hudson Canal Company for damages, and for an injunction. The referee dismissed the complaint as to the first cause of action, awarded damages to plaintiff as to the second cause of action, and found that plaintiff was entitled to an injunction. Judgment was entered on the report of the referee, and both parties appeal. The following are the opinions of HENRY E. SICKLES, Esq., to whom the case was referred, on the first and second causes of action, respectively:

"1. The language of the lease or contract upon which this action is based, as to the duties imposed upon the defendant in the matter of mining coal, is so clear and unmistakable that there can be no reasonable doubt as to its meaning. The defendant, the party of the second part, agrees ' to mine from said land, in the year one thousand eight hundred and sixty-four, not less than ten thousand tons of coal; in the year one thousand eight hundred and sixty-five, not less than ten thousand tons; and twenty thousand in each and every year thereafter; it being understood that the said party of the second part is to pay for ten thousand tons in each and every year, whether the same shall be actually taken out in such year or not, and that in case the maximum quantity of twenty thousand tons is not taken out in one thousand eight hundred and sixty-six, or any subsequent year, interest at the rate of seven per centum per annum shall be paid by the said party of the second part to the said parties of the first part, their heirs or assigns, upon such sums as the deficiency shall amount to, said interest to be continued until the full quantity agreed to be taken out as aforesaid shall be reached:' provided, ' that the said party of the second part shall have the privilege of taking out, without charge, at any time thereafter, a quantity of coal equal in amount to the deficiency they may have paid for in any previous year or years.' Then, after providing for certain contingencies, which, if they arise, may terminate or modify the liability of defendant, the contract continues: ' And the said party of the second part agrees to pay for the coal mined and taken out in pursuance of this agreement at the rate of twelve and a half ($12\frac{1}{2}$) cents for every ton of (2,240) twenty-two hundred and forty pounds of clear merchantable coal, exclusive of culm or mine waste, that will pass through a mesh of one-half inch square. * * * And it is further understood and agreed that, if the said party of the second part elect to do so, they may increase the quantity beyond that stipulated to be mined in any one year, and at their option may diminish the quantity for any succeeding year or years by an amount corresponding with such increase: provided, that the quantity mined shall not be less in the aggregate than as hereinbefore stipulated.' No ingenuity of argument will change the meaning of this language. The defendant obligates himself to mine not less than ten thousand tons of coal for the first two years, and not less than twenty thousand tons thereafter. If it fails so to do, provision is made for indemnity to the plaintiff for the breach. The defendant does not obligate itself to mine more under any circumstances, but, in precise and emphatic phrase, limits its liability to that amount. It has the privilege to mine more, but if it avails itself of that privilege, the excess is first to be applied

to make up deficiencies, if any, for former years, and then, if there is still an excess, it has the option to diminish the quantity (*i. e.*, to mine less than the prescribed quantity) 'for any succeeding year or years by an amount correspondent with such increase.' In other words, the defendant has the privilege of mining more than an average amount of 20,000 tons per year, (after the first two,) which it absolutely agrees to mine, but carefully limits its liability to that amount.    There are no words which expressly or by implication require the defendant to mine with reasonable diligence, and to import them' into the contract would be to materially vary and modify it, and this may not be done, however conclusively the plaintiff may be able to make it appear by parol evidence that defendant's officers and agents did in fact agree to so mine. The old common-law rule that parol evidence is inadmissible to vary or modify, to add to or take from, the terms of a written contract, is still preserved in all its vigor in this state.    There are very many cases which it is claimed have established exceptions to or modifications of the rule; but these exceptions and modifications are more apparent than real,—they simply define its boundaries, and exclude from it matters which are not included in its words. Thus, if the language of a contract is ambiguous, resort may be had to the surrounding circumstances, and sometimes to the statements of the parties, not to vary the terms of the instrument, but to show in what sense the parties understood them.    Where the words of a contract are plain, their meaning unmistakable, and they are conclusive as to the intent, no resort may be had to the circumstances or the statements to show that the parties really intended something else, except where a reformation of the contract is sought for because of mistake or fraud.

"The question has been very frequently before the court of appeals of late, and without citing a long array of authorities it will be sufficient, perhaps, to quote from the opinion of ANDREWS, J., in *Corse* v. *Peck*,[1] decided in June, 1886, to show the position of the court.    He says:  ' The rule that parol evidence is inadmissible to add to or vary the terms of a written contract precludes evidence of the negotiations which preceded, or conversations which accompanied, the making of it, unless necessary to explain ambiguous provisions, the meaning of which cannot be ascertained with certainty by an inspection of the written instrument.'    See, also, *Snowden* v. *Guion*, 101 N. Y. 458, 462, 5 N. E. Rep. 322.    So, too, it has been held that the rule does not apply where the original contract was verbal, and part only has been reduced to writing, or to collateral undertakings; but where the written contract indicates that it was the intention and design to express therein the whole contract between the parties, it is conclusive.    As said by FINCH, J., in *Eighmie* v. *Taylor*, 98 N. Y. 288, 294:  ' If we may go outside of the instrument to prove that there was a stipulation not contained in it, and so that only part of the contract was put in writing, and then because of that fact enforce the oral stipulation, there will be little of value left in the rule itself.'    It is claimed on the part of the plaintiff that, at least so far as the testimony of what occurred between her agent and defendant's president at the time of the delivery of the contract is concerned, it is competent, and that defendant is bound thereby.

"(1) That it was the interpretation put by the agents of the parties, who acted for them, upon the contract, and that the parties are thereby estopped from disputing it or claiming that the contract reads otherwise.    In other words, the argument is that, however clear and unambiguous may be the language of a contract, it is proper to show that the parties, in considering its terms, orally agreed that it should mean something else, and that something else must take the place of the words of the contract, and thus an entirely different contract be established.    When the courts go thus far, from that moment the rule considered so important, so carefully laid down, ceases to exist.

[1] 7 N. E. Rep. 810.

"(2) It is claimed that as the contract was delivered only in reliance upon the promise of defendant's agent that they would work the mine industriously, ' work out the greatest quantity of coal,' that this was enforceable as a separate and independent agreement.  Such a parol agreement, to be enforceable, must be consistent with the terms of the written contract, not directly antag-onistic to and subversive of it.  The cases cited by the learned counsel for the plaintiff go no further than this.  I listened with interest to his ingenious and able argument, and perused with care his exhaustive brief, and would not have been displeased could I have had pointed out to me some practicable way to avoid the rule, as there is an apparent equity in her case.  But I find none in the argument or brief, and the oral evidence must be rejected unless an-other position counsel takes is maintainable, and that is

"(3) This is a Pennsylvania contract, and its constructions must be gov-erned by the laws of that state, and in that state written contracts may be changed or modified by parol evidence.  It is not claimed that there is any statute in Pennsylvania which controls the subject, but that it is a modifica-tion made by the courts of that state of the common-law rule.  There are cases in that state as in this, where, to prevent the doing of an injustice, the courts have been ingenious in avoiding the rule, and in discriminating between it and the case under consideration.  But there were none called to my atten-tion which go to the length necessary to aid the plaintiff here.  But, again, the question depends upon a rule of procedure, *i. e.*, as to the reception or re-jection of evidence, and this is a field into which the laws of another state can-not intrude; it is to be determined exclusively by the laws of this state.  I am constrained, therefore, to grant the motion to strike out the testimony ob-jected to as to the negotiations and conversations preceding, and those ac-companying, the delivery of the lease, and as to the first count to dismiss the complaint.

"The motion° to dismiss as to the second count is denied.  There is some evidence tending to show that defendant has exceeded the rights given to it by the lease, extensive as they are.  It would not be profitable to discuss this evidence for the purpose of determining the particulars in which plain-tiff's rights have been violated, the extent of such violation, or, perhaps, to determine definitely that a cause of action had been absolutely established.  Suffice it to say there is evidence tending to establish a cause of action, and which will not justify a nonsuit.

"2.  The causes for complaint for alleged illegal action on the part of de-fendant, for which plaintiff seeks redress under the second count of her com-plaint, are threefold: (1) That defendant, instead of using the privileges which were granted to it solely for the purpose of enabling it to carry out the provisions of the contract (Exhibit A) in regard to the mining of the coal on plaintiff's land, exclusively, or principally for that purpose, has unlawfully used them for the mining of its own coal, and this to such an extent that it has seriously interfered with the work to aid in which they were granted; (2) that defendant has excavated and is using a gangway connecting the Marvin shaft with defendant's other collieries, not for any object or purpose connected with the mining of the coal in plaintiff's land, but mainly for the purpose of draining the water from the other collieries down upon plaintiff's land, and thus is imposing a burden upon the said land not authorized or contemplated by the contract; (3) that defendant is piling the culm or refuse coal arising from the coal mined from its land upon the surface of plaintiff's land, thus appropriat-ing and using so much of the surface for its own purposes, which is not needed or used for the purpose for which alone defendant is entitled to use any por-tion of the surface.  The facts alleged are established by the evidence, and I am satisfied that by no reasonable construction of the instrument (Exhibit A) is the use thus made of plaintiff's property, and the burdens so imposed upon it warranted or authorized thereby, and neither the able arguments of defend-

ant's counsel, nor a careful perusal of the learned and exhaustive brief furnished by them, and examination of the authorities cited, have convinced me to the contrary.

"*First.* That the object that the parties had in view in entering into the contract, (Exhibit A,) at least so far as appears from the terms and provisions thereof, was the mining of coal that might be found in plaintiff's land; that the rights and privileges granted by plaintiff to defendant were merely as incidents, and were designed to be limited to the actual requirements for a successful accomplishment of that purpose, can scarcely be successfully disputed. The plaintiff grants to defendant the right, and defendant assumed the obligation to mine all the coal in said land which can be economically mined, and, to enable the defendant to exercise this right, and to perform its covenants, plaintiff grants to it the right of way for all 'railroads, * * * slopes, tunnels,' etc., it 'may find necessary to construct across or upon said tract with the right to erect dams upon the surface for the proper mining of said coal; also the use of land for digging all air shafts that they (*i. e.*, defendants) may consider necessary, with the right to dig the same; also the use of all the land they may require for the purpose of erecting * * * buildings they may deem necessary for the prosecution of their business, together with land for piling coal or culm, and all other appurtenances they may require for mining, * * * preparing, and forwarding the coal to be mined under this agreement.' By the very language of the agreements, the rights and privileges are limited to the necessities of the work contemplated. It may be conceded, as defendant's counsel claim, that defendant is the sole and exclusive judge as to what is necessary, but in determining that question it may look only to this work. It is not authorized to take into consideration any other object or purpose. If it did consider or was influenced in its determination by other purposes connected with its adjoining property, it was not authorized by the contract, and was a breach of good faith. When, therefore, defendant sunk the Marvin shaft, and erected the breaker and other buildings, its officers, through whom it acts, virtually announced to plaintiff, 'We consider works of this size and capacity necessary for the successful and profitable mining of the coal in your land as rapidly as we propose to mine it,' and inasmuch as the shaft and breaker, etc., were clearly and admittedly of much greater capacity than would be required for the mining of the twenty thousand tons per annum, which defendant bound itself to mine, and to which it limited its obligation, their construction was an announcement to plaintiff that defendant had elected to avail itself of the option given to it to mine a greater quantity. Plaintiff, therefore, had a right to assume that defendant intended and in good faith required that it should use the shaft and structures, primarily, at least, for the mining of the coal in her land. Plaintiff was interested in having this coal mined as rapidly as possible, and the greater the capacity of the structures, so long as they were no greater than was necessary for this purpose, the better it suited her interest. The fact, therefore, that plaintiff did not object to the sinking of a shaft, and the erection of a breaker of the size and capacity of the one in question, was not a concession of a right to exceed the necessities of the case. It seems to me justice and equity entitle her to insist that inasmuch as defendant has, in the exercise of its right to determine what those necessities require, determined that these structures were necessary for the mining of the coal in her land, it is estopped by that determination, and may not now claim that they were in fact much larger than were necessary, and so that it could use them for purposes of its own without interference with the proper and expeditious mining of plaintiff's coal. It remains then to be seen whether the contract gives to defendant a right to use these structures for mining of coal on its own land, where it does interfere with the mining of plaintiff's coal; in fine, whether defendant has the right to elect so to do, provided it pay the royalty on twenty thousand tons per annum, to

stop entirely the mining of coal on plaintiff's land, and to use the structure it has erected, and the excavation it has made, exclusively for mining its own land, as, if the argument of defendant's counsel is tenable at all, it must go to this extent. A right so inconsistent with the spirit and intent of the contract, so subversive of its purposes, should be based on clear and unmistakable language in the contract. It is claimed to exist under this clause therein: 'And it is further agreed and understood that the party of the second part * * * may use and occupy the rights and privileges hereby granted, and the openings, buildings, fixtures, and appurtenances made and constructed by them for the mining, preparing, and forwarding coal from any adjoining or contiguous lands until all the land they desire to take coal from and that can be mined and taken out through said openings, shafts, and slopes shall be exhausted.' Following this is this provision ' that the party of the second part * * * shall have the right to rebuild, reconstruct, or remove any and all the buildings, fixtures, * * * and improvements during the continuance of this agreement, and until the coal in the adjoining and contiguous lands that can be worked from those openings, shafts, slopes, and tunnels shall have been worked out.' These two provisions are at the end of the contract, after full provision has been made for the mining of all of the coal on plaintiff's land that defendant obligates itself to mine, and after full provision is made for the termination of its obligation in this respect. The language of the two clauses, as well as their position in the contract, instead of conveying by any reasonable construction the idea that the rights thus granted were to be exercised while the obligations imposed upon defendant as to the mining of the coal in the land in question remained unfulfilled and in force, and while they would interfere with or retard that work, indicate that they were to be exercised only after the main purpose of the contract was substantially carried out and accomplished; and, inasmuch as only rights and privileges necessary for this work are granted, they cannot well be used during the prosecution of the work for other purposes without interfering with and retarding the work. That the purpose in view in making the contract had been subordinated to defendant's other purposes, and that the rights and privileges granted solely as aids to the accomplishment of that purpose have been used principally for the mining of coal on defendant's other land, and for the benefit of its other collieries, cannot be disputed. Defendant has mined up to May 1, 1886, through the Marvin shaft, 497,614 tons of coal from plaintiff's land, and 608,771 from its own. In November, 1886, the last month for the working of which an account was presented, it mined 3,027 tons from plaintiff's land, and 9,609 tons from its own. It did mine in one year from plaintiff's land over 89,000 tons, thus showing its capacity in that respect, and yet the average output is only about half that amount, and is gradually growing less, while that from defendant's land is increasing. But, it is urged by defendant's counsel, the company mined and has paid to plaintiff the royalty on more than the quantity of coal it obligated itself to mine from her land, and therefore she has sustained no damages, and is entitled to no relief. Plaintiff has submitted to the imposition of heavy burdens upon her land, under the supposition, as I have attempted to show, that they were to be used for her benefit. That they would have been so used to a much greater extent, at least, than they have if defendant had not assumed to use them to such an extent, for his own purposes, is very clear, and if it is permitted to continue such use, the inducement will always be to subordinate the interests of plaintiff to its own, to mine the coal upon which it pays nothing in preference to that upon which plaintiff is entitled to royalties, and it is in precisely such a case where plaintiff cannot be compensated in damages for the injury inflicted upon her that the aid of a court of equity may be invoked. If defendant be prohibited from exceeding the privileges granted to it by the contract, the temptation to make the plaintiff's interest subordinate to its own will be

removed. If it had worked the colliery to its full capacity in mining the coal in which plaintiff is interested, it might, perhaps, have urged with plausibility that it should not be restrained from mining what coal could be mined from its own land through the shaft and breaker without interference with such working. But, as it has not shown a disposition to thus work the colliery, it cannot complain if it be confined to the exercise of the privileges granted by the contract. It seems to me, therefore, that plaintiff is equitably entitled to a judgment restraining defendant from using the shaft, breaker, etc., for mining its own coal until the coal in plaintiff's land, so far as defendant is bound to mine it, is removed.

"*Second.* The gangway driven to connect the Marvin with the Leggett's Creek and Van Storch shafts concededly was not excavated for the purpose of mining the coal in question. According to defendant's testimony it was, in the first place, designed to serve as a second opening to comply with the requirements of the Pennsylvania laws, enacted some ten years after the execution of the contract, and then, it having been discovered that it could be used advantageously for that purpose, it was arranged and finished so as to serve as a drain to bring the waters collecting in the other two collieries down to the Marvin shaft, thus saving to defendant the expense of running the pumps in the other collieries. Defendant claims the right to do this (1) Because it owns the vein of coal in plaintiff's and the adjoining lands, and had the right to drive the gangway through it for any purpose it deemed it best so to do. (2) Plaintiff has no remedy if, in the ordinary course of mining, the water is discharged upon her land. It is not necessary to dispute the proposition that defendant is by the contract in question made the owner of the coal. Conceding this for the purpose of the argument, plaintiff still remains the owner of the layers of earth and rock between the veins of coal. Defendant excavated down to the layer under the fourteen-foot vein, and so discharges the water upon plaintiff's land. The gangway was not made in the ordinary course of mining, and so the authorities cited, which hold that in the ordinary course of mining coal or minerals may be taken up the line of the adjoining land; that a party is not bound to have a barrier to prevent the water from flowing into the mine of an adjoining owner does not apply. But this was not done in the ordinary course of mining, and I have yet to learn of a decision holding that a person may lawfully dig a ditch upon the surface of his land so as to gather the surface-water thereon, and discharge it upon the land of his adjoining neighbor, or may drive a gangway from his mine to the line of an adjoining owner for the purpose of discharging the waters collecting in his mine into that of the adjoining owner. The authorities cited by defendant's counsel sustain no such doctrine. In one of them, *Iron Co.* v. *Taylor,* 1 Leg. Chron. 36, is cited with approval a clause in the opinion in the case of *Consolidated Coal Co.'s Appeal,* 54 Pa. St. 183, 189, as follows: 'Had it been made manifest that the consequence of the defendants' operations would have the effect of letting water in large quantities into the plaintiffs' mine, it would assuredly have been proper to have enjoined them, even although they were operating exactly within the terms of their lease.' In that case a motion for a preliminary injunction was denied, but the court say that if it appears on the trial that the danger exists it can be guarded against by the judgment. Another case is also cited, (*Iron Co.* v. *Gorrell,* 29 Leg. Int. 101,) which holds as follows: 'Where the miner, in his upper mine, in carrying forward his gangway strikes into a breast which has been wrongfully worked by a trespasser up to the dip of his coal vein, he is not justified in emptying the water flowing down the drain or gutter of his gangway into the opening thus struck, if, by reasonable means, he can carry the water into his own dump,'—that it was the duty of the upper owner to carry off the water, even though a trespass had been committed upon him. The court say: 'To adopt the principle that the upper owner is liable for no act done within his own mine, and no neglect be-

'cause it falls within his own property right, would lead to results disastrous to mining, and cannot be tolerated.' It is hardly necessary, however, to cite or discuss authorities. Suffice it to say none go to the extent necessary to sustain defendant's contention. But it is urged the use of the gangway as a drain is a great convenience and benefit to defendant, and is no injury to plaintiff. This is hardly an excuse for an unlawful interference with another's rights; but if no serious damage has thus far been occasioned, such damage may result at any time. If the pump in the Marvin shaft should become disabled, or the working thereof should cease because of a strike, (a contingency not altogether improbable in these days,) or from any other cause, the water that is being poured down from the defendant's other collieries into the Marvin shaft would soon flood that colliery, and for a time utterly prevent the mining of coal therefrom. Defendant has no right to impose this burden and this risk upon plaintiff, and she has a right to ask that it be restrained from so doing.

"*Third.* The right claimed by defendant to deposit all of the culm or waste coal arising from the coal mined through the Marvin shaft from defendant's adjoining land upon the surface of plaintiff's land, as well as that coming from the coal mined from her own land, seems to me an extraordinary one. If it be true, plaintiff, in executing the contract, virtually surrendered all right to the surface of her land, and cannot safely sell one foot of it. It appears that defendant has from 800 to 1,000 acres of land adjoining plaintiff's land, the coal from which can be mined to advantage through the Marvin shaft. The coal from 'the farm,' which contains 500 acres, can be mined in no other way, unless a new shaft is sunk, and it is the evident purpose of defendant to mine it all through the Marvin shaft. A very moderate estimate of the coal from defendant's adjoining properties already and hereafter to be mined through the Marvin shaft is 20,000,000 tons. Add to this say 3,000,000 tons for the coal from plaintiff's land, the whole amounts to 23,000,000 tons. There has already been mined 1,100,000 tons. The culm from this covers seven acres and seventeen perches of land, to a depth of between forty and fifty feet. If the balance yet to be mined yields culm in anything like the same proportions, it would cover the whole surface of plaintiff's land not used by defendant for other purposes to a depth of at least seventy feet. If, then, defendant has the right claimed, it has the right to appropriate the whole surface. The language of the contract must be strong and unequivocal, indeed, which will authorize a court to arrive at a result so disastrous, and yet the claim is based simply upon a grant of the right to use so much of the surface as shall be necessary for the deposit of the culm from the coal mined from plaintiff's land. The provision of the contract, authorizing the use of the rights and privileges granted for purposes connected with the mining of the coal from its own land, does not purport to extend the right granted so as to make it cover land not necessary for the purposes specified. Now, there is marked distinction between the use of the surface for the deposit of culm and the use for other purposes connected with mining. For the latter the use is but temporary, and the portion taken, when not being used for purposes connected with mining plaintiff's coal, may be used for mining that of defendant's, without imposing an additional burden, and the portion required to be taken must be a matter of judgment. Bnt the necessity to take land for the deposit of culm only arises as the culm is produced, and the use of the land taken for it is, in effect, a permanent appropriation, as the land is rendered valueless for building or other purposes. It can scarcely be claimed that defendant has the right at the outset to mark out and appropriate all the land it may deem necessary to use even for the deposit of culm from plaintiff's coal. Until needed plaintiff has the right to use it. If any culm arising from any other coal is deposited on plaintiff's land, then so much space which might have been used for the deposit contemplated by the contract is otherwise appropriated, and so

much additional land must be taken which would not have been required had the land so appropriated been used for the deposit of the culm from plaintiff's coal. Certainly, if I am correct in my first proposition, if defendant is not authorized to mine its own coal through the Marvin shaft until it has performed its contract as to mining plaintiff's coal, when that is done, the quantity of land required for the deposit of the culm therefrom will be definitely determined, and no more can be taken. Nor is it necessary to enable defendant to use and enjoy the rights and privileges granted to impose this heavy burden upon plaintiff's land. The Marvin shaft is located near the Lackawanna river, on the opposide side of which lies the defendant's 'farm.' By building a bridge across the river access can be had to the farm, and a convenient dumping place for its own culm can be reached. It seems to me, then, as there is no express grant to defendant in the contract of a right to deposit culm arising from the coal mined in its own land, upon the surface of plaintiff's land, as no such deposit can be made without appropriating land not necessary for the deposit of culm from coal mined under the contract, and as, so far as this question is concerned, the right to use only so much of the surface as is necessary for that purpose is granted, defendant exceeded the rights granted, and was guilty of a trespass in depositing the culm from its own properties upon plaintiff's land, and to the extent of the injury thus inflicted, it is liable, and plaintiff is entitled to judgment restraining any such further unlawful use of her land, it appearing that such use is contemplated and the right thereto asserted. It does not appear in the case what is the usual or reasonable height to which deposits of culm are or should be carried. It may, perhaps, be inferred from the testimony that more culm may yet be deposited on the land already appropriated for that purpose. It does appear that the surface so covered is rendered useless; that it was worth $1,500 per acre; that a little over seven acres have been covered with the deposit; that about six-elevenths of such deposit was made without right,—and perhaps it would not have been unreasonable to have allowed to plaintiff by way of damages the full value of six-elevenths of the land taken. I have concluded, however, to allow $3,000, the value of two acres, and, if I am right in my views as to the construction of the contract, this cannot be considered an excessive allowance."

Argued before SEDGWICK, C. J., and FREEDMAN and INGRAHAM, JJ.

*George C. Genet*, for plaintiff. *Mathews & Smith*, (*Mathew Hale* and *Frank E. Smith*, of counsel,) for defendant.

SEDGWICK, C. J. Excepting in a single respect, the findings of fact and the opinion of the referee have convinced me that the judgment ordered by him should stand. I think, however, that the adjoining part of the judgment should be changed by inserting in the second subdivision of the judgment, immediately before the words "until all the coal which it is authorized," the following words, "excepting during such times as defendant shall use said shaft, breaker, machinery, or other structures for the mining, preparing, and forwarding coal in and from plaintiff's said land to the amount or quantity such shaft, breaker, machinery, and other structures, are or shall be adapted to mine, prepare, and forward ore." As thus modified the judgment is affirmed, without costs to either party. Notice of settlement of the order to be entered is to be given.

FREEDMAN, J., concurred.

INGRAHAM, J., (*dissenting.*) I concur with my associates that on the appeal of the plaintiff the judgment should be affirmed for the reasons stated in the opinion of the referee. I am, however, unable to agree to the conclusion arrived at on the appeal of the defendant. The agreement, which it is necessary to construe, is dated the 28th of March, 1864, and is a lease from the

plaintiff to the defendant of all coal contained in, on, or under a certain piece of land in the county of Luzerne, state of Pennsylvania; said coal to include all the coal that can be dug from the premises described, together with the right to enter upon and into the said lands, and to dig, mine, and remove from the described premises the said coal through or out of any shaft, etc.; that the defendant may dig, upon the premises; and the said agreement further leases to the defendant lands for piling coal or culm and all other appurtenances they may require for mining, receiving, removing, cleaning, screening, dumping storing, preparing, and forwarding coal to be mined under this agreement. The agreement also provided that the said party of the second part should not be held accountable under any circumstances for any damage that may be done to the surface of said land by the mining, preparing, and removing of said coal. Said agreement then provided that the said parties of the second part should pay for 20,000 tons in each and every year, whether the same shall be taken out in such year or not, and the party of the second part agrees to pay for the coal mined and taken out in pursuance of this agreement at the rate of 12½ cents for every ton of 2,240 pounds. And the said agreement also contained the following provision: "And it is further agreed and understood that the parties of the second part, their executors and assigns, may use and occupy the rights and privileges hereby granted, and the openings, buildings, fixtures, and appurtenances made and constructed by them for the mining, preparing, and forwarding coal under this agreement, for the mining, preparing, and forwarding coal from any adjoining or contiguous lands until all the lands that they desire to take coal from, and that can be mined and taken out through said openings, shafts, and slopes, shall be exhausted." The referee found that from the year 1876 to the date of his report the defendant had mined through shafts upon the plaintiff's property the aggregate amount of 1,106,-385 40-100 tons of coal, of which 497,614 3-100 tons were mined from plaintiff's land, and the balance mined from other lands of the defendant contiguous to the plaintiff's land. That all the culm or waste coal from the coal mined through the shaft on the plaintiff's property, known as the "Marvin Shaft," had been deposited on plaintiff's land, and the land thus taken by the defendant for that purpose is upwards of seven acres, upon which land the culm is now piled up to the average height of from 40 to 50 feet. The contract in question is a peculiar one, and some of its provisions are certainly very onerous upon the plaintiff, but it is the contract made by the parties that has to be construed. The court has no power to make a new contract to relieve the plaintiff from the provisions of the contract made. The legal effect of the agreement is to convey to the defendant the coal in the plaintiff's property capable of being profitably mined, (*Sanderson* v. *City of Scranton*, 105 Pa. St. 469,) with the right to the use of the property for the purpose of mining and preparing such coal for market, together with the necessary land for piling the coal or culm to be mined under the agreement. These are rights and privileges that are expressly given to the defendant, and are as much the property of the defendant as the coal which it has purchased, and without which the coal itself would be of little or no value; and when the plaintiff gave to the defendant the rights and privileges granted by the contract for the mining, preparing, and forwarding coal on plaintiff's land for the mining, preparing, and forwarding of coal from the adjoining or contiguous lands, until all of the lands that they desire to dig coal from and that can be mined and taken out through said openings, shafts, and slopes shall be exhausted, they gave to the defendant the same right to use the lands of the plaintiff for the mining and preparation for market of its own coal as the defendant had to use the plaintiff's land for the mining of coal that was upon plaintiff's land. This right to use the plaintiff's land for the mining of coal on adjoining or contiguous lands was not limited by the agreement to any particular time. It was to continue until the coal on the contiguous lands was ex-

hausted. It did not depend upon the amount of coal taken from the plaintiff's land, nor do I see how by any reasonable interpretation of this contract it can be held that this use of the plaintiff's lands was to be subordinated to the mining of the coal on plaintiff's land. The defendant's liability was confined to the payment for 20,000 tons a year, and, so long as it is paid for 20,000 tons a year, it complied with its part of the agreement, and was under the agreement entitled to use the rights and privileges granted, and the openings, buildings, fixtures, and appurtenances made and constructed for the mining, preparing, and forwarding coal on plaintiff's land for the mining, preparing, and forwarding coal from the adjoining or contiguous lands; and to insert into the agreement a provision that this right was not to be exercised until all the coal on plaintiff's property was mined, would be the insertion of an entirely new clause in the contract, and the result would be that the court would make a new contract, not construe one already made. The judgment also restrains the defendant from depositing culm from coal from the lands other than the lands of the plaintiff upon the surface of the plaintiff's lands. By the agreement the plaintiff gave to the defendant "the use of all the lands they may require for the purpose, * * * together with the lands for piling coal or culm and all other appurtenances they may require for mining, receiving, removing, cleaning, screening, dumping, storing, preparing, and forwarding the coal to be mined under this agreement," and the same privilege was granted to the defendant for mining, preparing, and forwarding coal from any adjoining or contiguous lands. The right to deposit the culm on the plaintiff's land was a right necessary for the mining of the coal, and, as the referee found, necessary for the successful working of the colliery, and when the same right is given for the "mining, preparing, and forwarding coal on adjoining or contiguous lands," the right to deposit the culm necessary for the proper mining and preparing for market of the defendant's coal was clearly granted. Nor do I think, upon the facts found by the referee, that the plaintiff is entitled to an injunction restraining the defendant from allowing the water to run from the mines upon the adjoining property, where the gangways through which the water runs were actually opened and used for the purpose of mining the coal on the adjoining property through the plaintiff's land. There is no allegation that the defendant is insolvent or unable to respond for any damages done to plaintiff's property by any of the acts complained of, which were not clearly allowed by the contract, and on the whole case I do not think the plaintiff is entitled to equitable relief. I think, therefore, that the judgment, so far as it is appealed from by the defendant, should be reversed, and a new trial ordered, with costs to abide the event.